IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HERMAN ORTEZ, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 18-561-MN-CJB |
| MICHAEL P. MORTON, P.A., | ) ) ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

In this action filed by Plaintiff Herman Ortez ("Plaintiff") against Michael P. Morton, P.A. ("Defendant"), Plaintiff alleges violations of the Fair Debt Collection Practices Act ("FDCPA"). Presently before the Court is Plaintiff's Motion for Class Certification and Appointment of Class Counsel ("Motion"), (D.I. 18), which is opposed by Defendant. For the reasons that follow, the Court recommends that Plaintiff's Motion be DENIED.[1]

**I. BACKGROUND**

**A. Factual Background**

Plaintiff Herman Ortez is a resident of New Castle County, Delaware, (D.I. 1 at ¶ 12), who formerly owned property at Le Parc Condominiums ("Le Parc"), (D.I. 20-2 at ¶ 6). Defendant, Michael P. Morton, P.A., is a law firm based in Greenville, Delaware, (D.I. 1 at ¶

---

[1] Pursuant to 28 U.S.C. § 636, the Court issues its decision as a Report and Recommendation. See 28 U.S.C. § 636(b)(1)(A) ("a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion . . . to dismiss or to permit maintenance of a class action"); see also 28 U.S.C. § 636(b)(1)(B) ("a judge may also designate a magistrate judge . . . to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)").

16), which represents the Association of Unit Owners of Le Parc Condominiums (the "Association"), (*id.*, ex. 1).

On or about February 21, 2018, Defendant sent a letter to Plaintiff (the "letter" or the "Feb. 21 letter"). (*Id.* at ¶ 23; *see also id.*, ex. 1) The letter explains there "is a substantial and critical life-safety infrastructure problem at Le Parc" and that in order to address that issue, "an assessment on all Unit Owners was made last summer to bring in dollars to begin the first phase of the professional work that must be done[.]" (*Id.*, ex. 1 at 1) The letter states that although 58% of the Unit Owners had by then paid the full assessment, Plaintiff had not done so, nor had Plaintiff agreed to a payment plan with the Association. (*Id.*) The letter goes on to explain that due to Plaintiff's non-payment, the Association referred collection of Plaintiff's assessment to Defendant. (*Id.* at 2) In the letter, Defendant encourages Plaintiff to either pay the assessment or arrange for a payment plan within the next 10 days. (*Id.*) However, Defendant explains that if the Association did not hear from Plaintiff within 10 days of the date of the letter, then the Association would "be left with no choice but to move forward in the manner that is provided for by" the "Delaware Uniform Common Interest Ownership Act, the Le Parc Condominium Association Declaration and the Code of Regulations (collectively, the 'Covenants')." (*Id.*)

At the end of the letter, Defendant included a section titled "Important Disclosures[.]" (*Id.*) That section read as follows:

> This is an attempt to collect a debt and any information obtained will be used for that purpose. You may dispute all or any portion of this debt within thirty (30) days of receipt of this letter by sending notice of such dispute to this office. Within ten (10) days of receipt of such dispute, this office will send you written verification of the debt. If you do not dispute the entire debt within such thirty (30) day period, this office will assume the entire debt is valid. If you dispute only a portion of this debt within such

> thirty (30) day period, this office will assume the undisputed balance of the debt is valid. If the creditor named herein is not the original creditor, this office will provide you with the name of the original creditor upon written request.

(*Id.*)

In all, Defendant issued a total of 17 letters that were substantially similar to the letter described above. (D.I. 20 at ¶¶ 3, 7) A total of 18 individuals residing in Delaware were mailed one of those 17 substantially similar letters; all of these letters were mailed to an address at Le Parc. (*Id.* at ¶¶ 3, 5) Another such letter was mailed to an address in Delaware, but it was returned as undeliverable; Defendant subsequently re-mailed that letter to an address in Texas. (*Id.* at ¶ 4)

## B. Procedural Background

Plaintiff filed his Complaint in the instant case on April 13, 2018. (D.I. 1) The Complaint, which is styled as a class action complaint against Defendant, contains two Counts alleging that Defendant violated certain provisions of the FDCPA. (*Id.*) More particularly, Plaintiff asserts that Defendant violated the statute because the Feb. 21 letter: (1) "does not set forth the amount of the Debt [owed by Plaintiff,]" allegedly in violation of 15 U.S.C. § 1692g(a)(1), (*id.* at ¶ 52); (2) "does not set forth a statement that, upon the consumer's written request *within [a] thirty-day period*, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor[,]" allegedly in violation of 15 U.S.C. § 1692g(a)(5), (*id.* at ¶ 53 (emphasis in original)); and (3) includes a demand for payment within 10 days that, when read in conjunction with other portions of the letter, "contradicts the FDCPA's validation notice[,]" in violation of 15 U.S.C. § 1692g(b), (*id.* at ¶ 66).

In the Complaint, Plaintiff defined the putative class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), as follows:

> All persons (a) with a Delaware address, (b) to whom Michael P. Morton, P.A., (c) within one year before the date of this complaint, (d) in connection with the collection of a consumer debt, (e) mailed an initial debt collection communication not returned to Michael P. Morton, P.A. as undeliverable (f) that (1) did not state the amount of the debt, or (2) advised the consumer that he should within ten (10) days from the date of the letter, either pay the now overdue assessment, fees and penalties in full, or contact the creditor to discuss how the consumer could arrange for a payment plan that will postpone collection actions by Michael P. Morton, P.A., or (3) did not state that upon the consumer's written request within the thirty-day period, Michael P. Morton, P.A. would provide the consumer with the name and address of the original creditor, if different from the current creditor.

(*Id.* at ¶ 35) Then, in his opening brief regarding the Motion, Plaintiff sought to modify that proposed class definition slightly, to now include "[a]ll persons with an address in the United States . . . to whom Michael P. Morton, P.A. mailed an initial communication that [had the characteristics described in the above-referenced portion of the Complaint]." (D.I. 19 at 1); *Wiesfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 259 (3d Cir. 2004) (noting that a plaintiff may revise his class definition in a motion for class certification).[2] Thus, in light of the way the class is now defined by Plaintiff and in light of the facts set out in Section I.A above, 19 persons (including Plaintiff) could possibly be a part of that class. (D.I. 20 at ¶ 8; D.I. 22 at 3)

Plaintiff filed the instant Motion on August 31, 2018, (D.I. 18), and the Motion was referred to the Court by District Judge Maryellen Noreika on September 7, 2018, (D.I. 21).

---

[2] Plaintiff explains that the rationale for altering the class definition was to more explicitly include in the putative class the one Le Parc resident to whom Defendant had to re-mail the Feb. 21 letter; this is the letter that was re-mailed to a Texas address, after it was originally returned as undeliverable. (D.I. 19 at 1 n.1)

Briefing on the Motion was completed on October 4, 2018. (D.I. 23) The case is currently stayed pending the resolution of the Motion. (*See* August 6, 2018 Oral Order)

## II. LEGAL STANDARD

Rule 23(a) states as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable [the "numerosity requirement"];
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Class certification requires a district court to delve beyond the pleadings and to determine whether each of the requirements set out in Rule 23(a) are satisfied. *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 315-16 (3d Cir. 2008).[3]

---

[3] In addition, in order to certify a class, "the Plaintiff must show that the class action falls within one of the three types enumerated in Rule 23(b)[.]" *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 309 (3d Cir. 2016). If a class action is brought under Rule 23(b)(3) (as it is in this case), (D.I. 19 at 5), that part of the Rule requires that: (1) common questions of law or fact predominate; and (2) the class action is the superior method for adjudication. *In re Modafinil Antitrust Litig.*, 837 F.3d at 248; *see also* Fed. R. Civ. P. 23(b)(3). Additionally, a plaintiff seeking certification of a Rule 23(b)(3) class must also show that the class is ascertainable by demonstrating: "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (internal quotation marks and citation omitted).

"The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *In re Modafinil Antitrust Litig.*, 837 F.3d at 248 (internal quotation marks and citation omitted); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320. In other words, "to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 320.

## III. DISCUSSION

Defendant's only challenge to Plaintiff's showing regarding class certification relates to one of the four factors set out in Rule 23(a): the numerosity requirement. Defendant argues that Plaintiff has failed to satisfy that requirement, and that this is "fatal to [Plaintiff's] request for class certification." (D.I. 22 at 4; *see also id.* at 1)[4]

Rule 23(a)(1) sets forth the numerosity requirement; as noted above, the Rule states that the requirement is satisfied when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The text is, however, conspicuously devoid of any numerical minimum required for class certification." *In re Modafinil Antitrust Litig.*, 837 F.3d at 249. The United States Court of Appeals for the Third Circuit has found that, generally, if the plaintiff demonstrates that the potential number of class plaintiffs is greater than 40, the first prong of Rule 23(a) has been met. *Id.* at 249-50. It has also noted that leading treatises in this area recognize that the general rule is that: (1) classes of 20 or fewer are "usually insufficiently numerous"; (2) a class of 41 or more is "usually sufficiently numerous" and (3) classes of

---

[4] In light of the Court's recommendation herein—that Plaintiff has not satisfied Rule 23(a)'s numerosity requirement—the Court need not address Plaintiff's showing as to any other of Rule 23's requirements. *Cf. Gonzalez v. Corning*, 885 F.3d 186, 192 (3d Cir. 2018).

6

between 21 and 40 members are given "varying treatment." *Id.* at 250 (internal quotation marks and citations omitted). The Third Circuit, however, declined to set a "'floor'" at which a putative class will fail to satisfy the numerosity requirement. *Id.* Instead, it noted that in a case where the putative class is less than 40 members, the district court's fact-based analysis of the numerosity requirement should be "particularly rigorous[.]" *Id.*

In analyzing numerosity, district courts should consider a non-exhaustive list of relevant factors, including: (1) judicial economy; (2) the claimants' ability and motivation to litigate as joined plaintiffs; (3) the financial resources of class members; (4) the geographic dispersion of class members; (5) the ability to identify future claimants; and (6) whether the claims are for injunctive relief or for damages. *Id.* at 253; *see Malvern Inst. for Psychiatric & Alcoholic Studies, Inc. v. Magellan Healthcare, Inc.*, CIVIL ACTION NO. 16-CV-4772, 2018 WL 3831397, at *4 (E.D. Pa. Aug. 10, 2018). However, these factors are not all created equal; "judicial economy and the ability to litigate as joined parties are of primary importance." *In re Modafinil Antitrust Litig.*, 837 F.3d at 253.

Here, the putative class is 19 persons, an amount that (because it is less than 40) is not presumptively sufficient to meet the numerosity requirement and that instead is "usually insufficiently numerous." Thus, the Court will analyze the relevant factors listed above to see whether, despite the less-than-40 total number, Plaintiff has met his burden with regard to the numerosity requirement.

**A. Judicial Economy**

The judicial economy factor "looks to the administrative burden that multiple or aggregate claims place upon the courts." *In re Modafinil Antitrust Litig.*, 837 F.3d at 254. "This

7

factor takes into account any efficiency considerations regarding the joinder of all interested parties that the district court deems relevant, including the number of parties and the nature of the action." *Id.* The analysis "primarily involves considerations of docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record." *Id.* at 257. In analyzing this factor, the focus is on "whether the class action mechanism is *substantially more efficient* than joinder of all parties." *Id.* at 254 (emphasis added).

Plaintiff contends that judicial economy favors numerosity because the class members' claims involve common legal questions (i.e., whether the Feb. 21 letter violates the FDCPA) and factual questions (i.e., what damages should be awarded). (D.I. 19 at 11) It argues that "[r]esolution of these issues in one action will avoid the risk of duplicative effort by multiple judges and attorneys, as well as potentially inconsistent rulings[,]" in contrast to what would occur if the various class members' claims were to be tried in multiple courts. (*Id.*)[5]

To be sure, there are some reasons why class treatment could streamline this litigation. For example, if the class members all opted to join the case as individual plaintiffs, that would likely involve additional process, such as that: (1) the various plaintiffs might choose to each retain their own counsel; (2) these individual plaintiffs might make different and non-overlapping discovery requests; and/or (3) the various plaintiffs might file non-duplicative

---

[5] And as to the latter point, Plaintiff errs in his judicial economy analysis because he weighs the judicial economy of a class action against the judicial economy of individual suits, not joinder. Rule 23(a)(1), however, requires that the class be so numerous that *joinder* of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Therefore, the judicial economy of class actions is supposed to be examined in light of the practicality of joinder, not in comparison to the potential for individual suits brought in different courts. *See In re Modafinil Antitrust Litig.*, 837 F.3d at 258 ("the numerosity rule does not envision the alternative of individual suits; it considers only the alternative of joinder").

8

motions as to certain subject matter. *See In re Modafinil Antitrust Litig.*, 837 F.3d at 257; *see King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2017 WL 3705715, at *7 (E.D. Pa. Aug. 28, 2017); *see also* (D.I. 23 at 5 (Plaintiff referencing the possibility that if plaintiffs are successful, this Court might be faced with various motions on the "right to attorney's fees from up to 19 different parties")).

And yet there are more compelling reasons why class certification would not be substantially more efficient than joinder. For one thing, the nature of the dispute in this case is about as cabined as it gets. The key issues revolve around the legal effect of one letter that was sent to only 19 different persons. (D.I. 19 at 14 (Plaintiff noting that "[t]he sole and dispositive legal question is whether [the] Verification Notice violates the FDCPA.")) Thus, it is hard to believe that the scope of discovery and motions practice will be significant. Moreover (and even assuming that all 19 putative class members are joined as plaintiffs), because the number of plaintiffs is not unduly large, it should not be overly difficult for this Court to deal with associated logistical issues.[6] Indeed, in patent litigation or asbestos litigation matters that are regularly filed in our Court, it is not unheard of for the number of parties to approach or exceed the number that might likely be involved in this case via joinder. *Cf. Wright v. Ristorante La Buca Inc.*, CIVIL ACTION NO. 18-2207, 2018 WL 5344905, at *9 & n.71 (E.D. Pa. Oct. 26, 2018) (noting, in finding that judicial economy concerns did not support certification as to a maximum class of 22 employees, that the court had recently tried a similar case as to 15

---

[6] Of course, there is no guarantee that all 19 putative class members will even join Plaintiff's suit. *See Christiana Mortg. Corp. v. Delaware Mortg. Bankers Ass'n*, 136 F.R.D. 372, 378 (D. Del. 1991) ("Courts have noted, for example, that joinder and intervention may be far simpler procedures because it is likely that not all the proposed class members will seek to join the suit.").

9

employees without delay or prejudice). Additionally, in a case like this, even if the various plaintiffs had individual counsel, it is to be expected that they would engage in "cost and resource sharing mechanisms" to help mitigate judicial economy concerns (such as joining in motions or responses to motions that were prepared by counsel for another plaintiff). *Cf. King Drug Co.*, 2017 WL 3705715, at *8 (finding that this factor weighed against certification in a complex case involving approximately 25 class members, where there was evidence showing that the class members had engaged in a "multitude of cost and resource sharing tactics" in the case).

For the above reasons, when comparing the efficiencies here, the Court does not see how a class action is "substantially more efficient than joinder of all parties." *In re Modafinil Antitrust Litig.*, 837 F.3d at 254. This factor thus favors joinder.

### B. Ability and Motivation to Litigate as Joined Plaintiffs

The "ability and motivation of parties to litigate as joined plaintiffs" factor primarily concerns the "stakes at issue for the individual claims and the complexity of the litigation, which will typically correlate with the costs of pursuing [such] claims." *In re Modafinil Antitrust Litig.*, 837 F.3d at 257. This factor is relevant to another purpose of the numerosity requirement: "further[ing] the broader class action goal of providing those with small claims reasonable access to a judicial forum for the resolution of those claims." *Id.* (internal quotations and citations omitted). If joinder would be "uneconomical for an individual with a negative value claim (after factoring in the costs of litigation, including hiring counsel and seeking discovery), that tends to weigh in favor of certification. *Id.*; *see also Tompkins v. Farmers Ins. Exch.*, No. 5:14-CV-3737, 2017 WL 4284114, at *4 (E.D. Pa. Sept. 27, 2017) (finding that this factor weighed in favor of

10

certification where the "maximum average value of the class members' claims was $5,586," which was a "relatively low figure in comparison with the potential complexity of the issues involved").

Here the ability and motivation of the putative class to litigate as joined plaintiffs in this case seems low. Recovery under the FDCPA is capped at $1,000 per plaintiff, 15 U.S.C.A. § 1692k(a)(2)(A), and although this litigation may not be particularly complex, "the size of the individual [FDCPA] claims is usually so small there is little incentive to sue individually." *Schwarm v. Craighead*, 233 F.R.D. 655, 664 (E.D. Cal. 2006) (internal quotation marks and citation omitted); *see also Weiss v. Regal Collections*, 385 F.3d 337, 345 & n.13 (3d Cir. 2004) (noting that "meritorious FDCPA claims might go unaddressed [absent class actions] because the awards in an individual case might be too small to prosecute an individual action" and that "[c]lass actions may be well-suited to the FDCPA"), *abrogated on other grounds*, *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016); *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 701 (S.D. Fla. 2004) (same).[7] For this reason, this factor weighs in favor of class certification.

### C. Financial Resources of Class Members

With regard to the next factor, the financial resources of the class members, the Court has little information. Plaintiff acknowledges that he "has not had the opportunity to adduce evidence regarding the financial resources of each member of the putative class." (D.I. 19 at 12) And Defendant adds nothing to the record on this point.

---

[7] *Cf. Walling v. Brady*, No. CIV.A. 94-410 MMS, 1995 WL 447658, at *3 (D. Del. July 19, 1995) (finding the numerosity requirement to be met in a class action matter involving issues relating to pension fund benefits, and describing a claim of $2,700 per plaintiff as "uneconomical" and favoring class certification).

11

Plaintiff nevertheless argues that because putative class members owe a debt to the Association (i.e., they, like Plaintiff, did not pay the assessment), they are "unlikely to have significant financial resources." (*Id.*) However, the Court does not think that one thing follows from the other. There may be all kinds of reasons why class members did not pay the assessment, many of which could have nothing to do with ability to pay (e.g., they had a principled disagreement with the contentions in the letter, or they hoped that by ignoring the letter, Defendant and the Association would simply go away).[8]

In the end, for the above reasons, the Court finds this factor to be neutral.

### D. Geographic Dispersion of Class Members

As for the geographic dispersion factor, courts in this Circuit have noted that when a class has members dispersed throughout the United States, that could cause "substantial difficulty [in] conduct[ing] discovery efficiently and [] coordinat[ing] the litigation." *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 WL 3563385, at *4 (E.D. Pa. Aug. 11, 2011) (coming to this conclusion in a case involving 30 entities, which were located in 14 different states and Puerto Rico). Courts also examine the practicability of joinder in light of the geographic dispersion of putative class members. *See Am. Sales Co. v. SmithKline Beecham Corp.*, 274 F.R.D. 127, 133 (E.D. Pa. 2010) (discussing the practicability of joinder in a proposed class of 33 putative class

---

[8] Defendant, for its part, argues that "[t]he financial resources of the putative class members is a non-factor in fee shifting cases such as FDCPA cases." (D.I. 22 at 7) But Defendant cites no case law in support of such a position. And even though the FDCPA includes a fee-shifting provision, that does not mean that class plaintiffs will be free of financial burden in such cases. Even if a class plaintiff hires an attorney who works on a contingency basis, the attorney might well require upfront payments for litigation costs. (D.I. 23 at 7) That prospect might vex a party with little cash on hand. And, of course, a class plaintiff with little means might be worried about *losing* their case, such that the fee-shifting statute would not end up playing to his or her benefit. (*Id.*)

members spread across 14 states); *see also Vinson v. Seven Seventeen HB Philadelphia Corp.*, No. Civ. A. 00-6334, 2001 WL 1774073, at *17 (E.D. Pa. Oct. 31, 2001) (assessing the practicability of joinder in light of the geographic dispersion of 11 named plaintiffs).

As to this factor, Plaintiff provided evidence (by way of a declaration and some associated internet-based address information) suggesting that as of mid-2018, one class member probably lived in New Jersey, one in Arizona and one in Florida; a fourth class member had addresses associated with both Delaware and Maryland. (D.I. 23-1 at ¶¶ 4-14 & exs. 1-5) And Plaintiff notes that a fifth class member—the one to whom a letter was returned as undeliverable, with the letter subsequently being re-sent to an address in Texas—might live in Texas. (D.I. 19 at 10; D.I. 20 at ¶ 4) (Defendant, without citation to the record, states that this last individual has "since returned to his Le Parc residence" and thus lives in Delaware.). (D.I. 22 at 9 n.3; *see also id.* at 3; D.I. 23 at 3 n.3) Presumably, in light of the fact that they resided at Le Parc as of the date of the Feb. 21 letter, the remainder of the 19 putative class members still live there (or elsewhere in this State).

For its part, Defendant dismisses any suggestion that geographic dispersion matters here. It argues that since Defendant is only subject to personal jurisdiction in Delaware, all potential plaintiffs (no matter where they now live) would have to bring suit in Delaware, regardless of whether the parties are joined or in a class. (D.I. 22 at 7, 9) The issue here, however, is not about where the plaintiffs would have to sue. Instead, it is about whether the plaintiffs' practical ability to litigate will be compromised by the fact that some plaintiffs reside out-of-state.

Yet on that question, Plaintiff does not really articulate *why* if a few class plaintiffs live in different states, this means Plaintiffs' overall case will be hindered. In that regard, it is worth

noting that two of the potentially out-of-state class plaintiffs have listed addresses within 100 miles of Wilmington. (D.I. 23-1, ex.1) This leaves only three putative class members (at most) who may be truly geographically dispersed. (*Id.*); *see also Christiana Mortg. Corp. v. Delaware Mortg. Bankers Ass'n*, 136 F.R.D. 372, 378 (D. Del. 1991) (finding that geographic dispersion did not make joinder impracticable where the 28 putative class members were located "either in the state of Delaware of within 100 miles of Wilmington").

On this record, the Court is willing to infer only that it would be a bit more difficult for the plaintiffs' group to work as a collective whole, in light of the fact that a few members of the class live far away. Without more specificity from Plaintiff, however, the Court is not willing to go further. *Cf. Martignetti v. Bachman*, CV 10-00548 DMG (ANx), 2011 WL 13257439, at *3-5 (C.D. Cal. Nov. 28, 2011) (finding that "geographical diversity is not an overwhelming barrier to joinder as the majority of the [19 to 41] potential class members resided in California [and] all but one of the potential out-of-state class members live in nearby Nevada").

Thus, this factor only slightly favors certification over joinder.

### E. Ability to Identify Future Claimants

With regard to the "ability to identify future claimants" factor, it appears that "the putative class member[s] [are] limited and defined to the nineteen (19) individuals identified[.]" (D.I. 22 at 10) Thus, this factor weighs against certification, as a class action construct is not required to help identify and bring other class members to the courthouse. *See Wright*, 2018 WL 5344905, at *10 (finding, as to this factor, that where both parties confirmed that there were a maximum of 22 class members and "no future claimants" the factor "strongly favors joinder over class treatment"); *see also Malvern Institute*, 2018 WL 3831397, at *5 (suggesting that this

14

factor militates against class certification where "identification of any future claimants would seem to be . . . a relatively simply process with the result that if any such claimants were interested in joining this litigation, they would find it fairly easy to do so").

### F. Whether the Claims are for Injunctive Relief or Damages

As to the final factor, it is undisputed that Plaintiff seeks only damages and does not seek injunctive relief. (D.I. 22 at 10) This factor thus "favors joinder over class treatment." *Wright*, 2018 WL 5344905, at *10; *see also King Drug*, 2017 WL 3705715, at *11 (noting that "[t]his factor weighs in favor of class certification where the claims are for injunctive relief rather than damages" and "weighs against certification" if plaintiffs are not seeking injunctive relief).

### G. Conclusion

Here, the factors relevant to the numerosity requirement are mixed. The two factors that are of "primary importance" are split, with one (judicial economy) favoring joinder and the other ("the claimants' ability and motivation to litigate as joined plaintiffs") favoring class certification. As for the other factors, two favor joinder ("the ability to identify future claimants" and "whether the claims are for injunctive relief or for damages"), one favors class certification, though only slightly ("the geographic dispersion of class members") and one is neutral ("the financial resources of class members"). This outcome is not necessarily surprising, considering the facts of this case. It is a case that, on the one hand, involves the FDCPA, a statute that typically lends itself to class action suits. And yet on the other hand, it is a manageable case involving a limited number of potential class members (who are largely concentrated in

Delaware, due to the fact that the dispute originated over an assessment at one Delaware condominium).[9]

In the end, the Court concludes that Plaintiff has not met his burden to show that the evidence weighs in favor of class certification. The relevant factors seem more heavily weighted toward joinder; at best for Plaintiff, the evidence on each side balances out. And in light of that, the Court returns to the Third Circuit's guidance: that classes of 20 or fewer are "usually insufficiently numerous[.]" That is the case here, as the Court will be well able to manage this litigation—one consisting of a limited, known number of plaintiffs and narrow legal and factual questions at issue—without certifying a class. *Cf. Reyes v. Julia Place Condominium Homeowners Ass'n, Inc.*, CIVIL ACTION NO. 12-2043, 2017 WL 430056, at *1-2 (E.D. La. Jan. 31, 2017) (decertifying a class of 18 condominium owners who paid allegedly usurious late fees on numerosity grounds in an FDCPA case, where only damages were at issue and where plaintiffs had no difficulty in locating or identifying the putative class members, even though some class members were dispersed around the country); *Martignetti*, 2011 WL 13257439, at *3-5 (declining to certify a class in an FDCPA case due to lack of numerosity, where the putative class contained anywhere from 19 to 41 class members, all but one of whom lived in either California or Nevada, and where the relief sought was primarily monetary in nature).

---

[9] In his opening brief, Plaintiff provides a string citation to seven cases, which were all said to be cases where district courts in this Circuit "certified class actions, like here, based on form communications and standardized debt collection activity." (D.I. 19 at 7-8) However, in addition to any other differences that existed in those cases as compared to the instant matter, in every one of the seven cases, the putative class included hundreds (and at times, thousands) of people. For that reason alone, the cases are not particularly comparable to this one.

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that Plaintiff's Motion be DENIED.[10]

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: March 29, 2019

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

---

[10] In his reply brief, Plaintiff asks that if this Court denies class certification, that it "should direct the parties to send notice to putative class members so that they can be made aware of their claims prior to the expiration of the statute of limitations and seek to join this case should they so desire." (D.I. 23 at 9) The Court hereby ORDERS that by no later than 7 days from the date of this Report and Recommendation, Defendant shall submit a letter of no more than two single-spaced pages indicating whether (in the event that the District Court affirms this Report and Recommendation) Defendant will object to this request (and if so, why).